and Mr. Greenfield will hear from him. Greenfield, not to be confused with Greenhill. All right. That's correct, and that confusion will happen. Good morning, Your Honors. My name is Daniel Greenfield on behalf of Plaintiff Appellant Alfonza Greenhill. Mr. Greenhill is a deeply – may it please the Court – Mr. Greenhill is a deeply religious person, relegated to Red Onion State Prison's most restrictive form of solitary confinement, known as SM0. Appellees are prison officials who have violated Mr. Greenhill's faith in two ways, by denying him access to Friday prayer, also known as Jumu'ah, and sanctioning him for wearing a four-inch beard. I intend to devote the bulk of my argument time to the Jumu'ah deprivation. Jumu'ah is an hour-long devotional service that observant Muslims must watch or attend weekly in the presence of three or more co-religionists. Weekly observance of Jumu'ah – I gather he takes the position that a television participation would satisfy that requirement. He does. Obviously, he would prefer to attend in person, but yes, he does take that position. Mr. Greenhill believes that failing to participate in the service is a terrible sin. In recognition of the importance of Jumu'ah, Red Onion offers the service in two formats weekly – in person and broadcast through the closed-circuit television system. But because prison officials prohibit all prisoners in solitary confinement from attending the service in person – I don't think the government contests the sincerity of his beliefs. That's true. Your point is well taken, and I'll move on. For years, Mr. Greenhill has asked prison officials to accommodate his religious beliefs by implementing one of the following alternatives to in-person worship. First – Let me ask you a preliminary question that goes to the substantial burden prong which would come under both the Free Exercise Clause and RELUPA. In the District Court's opinion, it recites at JA 462, two instances where Mr. Greenhill was given the opportunity to go to structured living phase 1 pod, a general population setting rather than segregation, where he could have television in his cell, among other privileges, which presumably would give him access to the Jumu'ah. But he twice refused to do that. So it seems like that he had it fully within his grasp to take an action that would get him into a reduced setting into the general population and give him access also to the Jumu'ah services. But he's the one who chose not to do this. It had nothing to do with disciplinary infractions or anything else. So if he makes the affirmative choice that he's not going to take this opportunity, how is his religious belief burdened? Two answers, Your Honor. First, assuming that Mr. Greenhill is solely to blame for his predicament, he would still be entitled to religious accommodation under RELUPA. This court has been clear that when a prisoner himself is at fault for the religious deprivation. That's been true, but I think every case that has dealt with that has dealt with it in a disciplinary genre, so to speak, that you couldn't hold whatever infractions they may have committed in the prison setting against them and that they had full rights to religious participation. But this seems a little different because here he's got a pathway, from what I can see, without penalty, to have full access to the religious services. But it's he himself alone that chooses not to take it. So is that wrong? For the purposes of this argument, I'll assume that you're correct and that he is solely to blame for remaining in SM0. That's what it appears from the record, from the district court's opinion. That may not be factually correct. I don't know. That's what it appears to be. I think a little background would be helpful. It appears that since Mr. Greenhill arrived at Red Onion in 2013, that he has, in fact, bounced around a little bit. And I won't dispute the fact that he's a recalcitrant and obstinate prisoner and that he has engaged in misconduct. But his refusal to abide by Red Onion's regulations regarding the step-down program do not absolve prison officials of the responsibility. We're going to assume all that's true. But this is a different circumstance. This has nothing to do with disciplinary actions or his prison record. He's given this opportunity twice to move into a lower security setting in the general population where he could presumably access religious services as he wants. But he says, no, I'm not going to do it. Well, okay, I think there are a couple complications with that. First, and this takes us into the Beard claim, although I wanted to devote my argument to Juma, it is undisputed that prior to 2017, Mr. Greenhill could not access a lower level of segregation. In other words, could not advance to SM-1 or SM-2 where he would be permitted to purchase a television if he had the funds as long as he maintained a beard. After 2017, the policy changed. From that point forward, it may have been possible for him to step down with a beard. Defendants have evidence that it was. Mr. Greenhill has evidence that it was. What criteria to go from SM-0 to SM-1 would he have to satisfy? Is it just a choice and say, I elect, or would he have to read their book and participate in their book and back then the grooming code? What are the criteria from getting from 0 to 1? The VDOC's rubric contains three or four primary criteria, one of which is respect. Another is hygiene, which includes adherence to grooming regulations. Another is total participation in the step-down program by completing the books. I don't mean to dwell on this or cut into your answer to Judge Niemeyer, but what I'm talking about happened in 2013 and was totally unrelated to the step-down program. It would appear from what the district court recites. What you're talking about with everything else, I understand that, but this just seems to be different. Yeah, let me just clarify for one second. The general population environment that they are talking about, it's called SL-6. It's part of the step-down program. That would not afford him the ability to attend in-person JUMAA. That's an entirely different wing outside of the step-down program. Right. You're getting into it. Would he have to go to that as the question posed? No, no. He would have had access had he made this election to television. He would have had access to television if he could afford a personal television. Even in this SL-6, the least restrictive iteration of their security management unit, watching JUMAA was dependent on him having the funds to purchase a television. Get back to my question. I'm getting to the very question that's being asked, and that is, is it simply a matter of election? Could he have gone to SL-6 without doing anything, or would he have had to agree to go start in the step-down program with books and grooming and stuff? This isn't the incident that Judge Agee is talking about. Yes, I believe in 2013 he initially could have been in SL-6 as an initial assignment. However, he committed infractions between 2013 and 2015 that then relegated him to SM-0. So even if he had accepted their offer to begin the step-down program in SL-6, the least restrictive of the security management environments, he still would have wound up back in SM-0 because he committed infractions. So if we start the calendar in 2015, which from our perspective is what this lawsuit is about, is past the time that follows 2015 when he was placed in SM-0 again, then there is no way that he could step down to a general population environment just by his say-so. He was entirely at their whim as to whether he satisfied their various criteria. Your argument is that in order to get from 0 to 1, it would have been an incentive and that they were using the television as an incentive to get him up and in essence because he didn't participate, he's being punished by not having the television. Correct. The evidence in the record is that defendants use television access broadly, unfettered television access for entertainment and other purposes. That's a legitimate thing. Your question comes to can you take away the one hour of religious service? Right. Sure. Exactly. To be clear, he does not want to watch the nightly news or Sesame Street. He wants television access for one hour a week solely restricted to religion. Our position is that while the department is entitled to incentivize good behavior by restricting unfettered television access, they are not entitled to incentivize good behavior by restricting religious application. The Congress has been clear that religious freedom cannot be used as a carrot or a stick. It was incumbent upon defendants to put evidence in the record that there was no other means to further their compelling interest in safety and security beyond denying him one hour of access to Jummah a week. If we assume your arguments correct on this point, what would happen is there would be, and you tell me if you disagree with this, there would be a remand because it was error to grant summary judgment, but the state could still, when it goes back to trial, put whatever evidence in it wants for proving whether it's the least restrictive alternative or rationally related. It's just an evidentiary question at this point. Absolutely. Absolutely. It seems to me on the record, undisputed record, is that when he's in SM0, he's denied access to a television and the state has not suggested they couldn't do that. They've suggested it's at the pod and it's in a classroom or they could bring a television into the cell. They've agreed they could do all those things without undue difficulty. They basically say it's an incentive program and he's unwilling to participate. I'm inclined to agree with you because it supports my case. I understand. I guess the question I would have is where is your motion for summary judgment on that question if there really isn't a factual dispute as Judge Niemeyer suggests? Right. So I think that we are now beyond the summary judgment stage. Defendants have had two bites of this apple. At trial, they would certainly... I mean, the district court entered a order granting summary judgment. There's no cross appeal that there was error in not granting a motion for summary judgment to you if you made one. So I don't know how we get past the summary judgment stage arbitrarily. It is our position. Now, I just want to be clear. Mr. Greenhill did not have a lawyer below and is entitled to a liberal construction of his pleadings. But Mr. Greenhill, it was defendant's burden at summary judgment to establish that they could not provide him access to Juma consistent with their... For RLUIPA purposes. For RLUIPA. Under the free exercise clause, it was Mr. Greenhill's burden. And our... Sort of a moot point. I mean, even if the state wins on the free exercise, you win on RLUIPA, you win. Right. Certainly as to injunctive relief. And so our position is just that the state has had multiple opportunities. Summary judgment was briefed twice. But what's the factual question? In other words, as I see it, the district court and the state have taken a single position. This is the state's brief. State says, Greenhill's access to television claim fails. The department has compelling interest in incentivizing and maintaining safety and security in the prisons and being able to classify inmate television access as a privilege to be earned rather than an absolute right is narrowly tailored to advancing that interest. That is the proposition, legal proposition that the district court adopted. If that's a correct proposition, you're going to lose. If that's an incorrect proposition, you're going to win. And I don't see where the factual dispute is. Perhaps on the Juma claim there is no remaining factual dispute and this court could then rule in his favor without remand for trial. What would be the factual issue resolved? I mean, he's in solitary confinement, SM-1. If the only way he gets in television is part of an incentive program, then the state takes a position that that's a good state interest in maintaining safety and rehabilitating prisoners. And I agree, that's all true. But as a legal proposition, is that a defense to the denial of access to the television? And if it isn't as a matter of law, that's the legal position they've taken throughout their brief and that's the only position argued by the district court. Your Honor, I think you're correct. I think that defendants have put forth a very broad rehabilitation interest. And that's a good interest. It's a good interest. The question is how does that fit in with RLUIPA and the First Amendment, I think, is also charged. Correct. Defendant's evidence simply doesn't go to the question before this court. Defendant's evidence goes to a different prisoner who sought television for the purposes of entertainment. And in their rules and regulations, they allow SM-0 to have television. You look in their things. So they're withholding it as an incentive to encourage him to go to the step-down program. That was their argument. I would say they not just allow it. Their regulations seem to require and seem to envision that religion cannot be used as a carrot or a stick. And if you look at the chart, it's in the record, SM-0, you get television access. For religious and educational purposes. I know you have a red light before you and I apologize, but I did want to ask you, because it's mentioned in the briefing, there seems to be some disagreement between the parties with respect to examining the least restrictive means analysis. Does the Department of Corrections have to consider only suggestions that Mr. Greenhill makes, or do they have to undertake their own independence assessment and decide what might be the least restrictive policy and practice? It's our position that the latter is required under the case law, but even assuming it's just the former, Mr. Greenhill has put forward three easily attainable alternatives to the status quo. One, that he could be taken to a classroom that pre-exists on his pod and placed in a cage that's already there in a room that's already wired for television. Two, that they could stick a television on the communal wall outside his cell, which is pre-wired, and that he could watch through the window of his cell and listen and hear to Jummah. Three, that they could loan him a television for an hour a week. Also on the record is the fact that prisoners are entitled to JP4 and JP5 players, which are like iPads, not SM0 prisoners, but presumably that could be passed to him through a chuck hole, loaded with Jummah, and then they could ask for it back at the end of an hour. It seems beyond trivially easy to accommodate this particular religious requirement. So we would not have to decide the issue of what the burden is in determining to resolve Mr. Greenhill's claims? That's correct. He's satisfied it under either rule, although it is our position that the broader rule is applicable. If there are no further questions, I'd like to reserve the rest of my time. Okay, Mr. Hytens. Good morning, Your Honors, and may it please the Court. My name is Toby Hytens on behalf of the defendant, Appelese. This Court has recognized that maintaining prison safety and security, while also respecting prisoner religious liberty, presents great practical challenges. And I'll go straight to the Jummah question because we haven't been speaking about the Beard policy. I actually think all of those points you make, you go in your brief, you repeat it again and again, I think it's absolutely true. I mean, as a matter of fact, it looks like a very good program, well-thought-out program to incentivize. But the difficulty is that is not a defense to RLUIPA. In other words, you take the man at SM0 and say, like you say here at another part in your brief, you say, as a result, the department classifies television access as a privilege rather than a right, and something that SMO offenders may earn as they progress through the step-down program. That's not an answer to if he doesn't choose to go through the step-down program or his infractions don't allow, he's still entitled to RLUIPA benefits. And your defense would have to be something that would satisfy strict liability. I mean, it's very strict liability the way the statute is written. And you guys have acknowledged that it could be done in the classroom or it could be done in the pod or it could even be done in a cell. I don't think that's the issue. The issue is whether it interferes with your safety program. And the answer is it may in a very small part, but I don't think that's a defense. In other words, you can't use religion as a stick, a carrot and a stick proposition. If you agree to our propositions, we'll give you religion. But if you don't, we'll take it away. And I think that's your entire argument in your brief, and that's what the district will do. So you can address that, and that's my concern. There's a lot there, Judge Niemeyer. As you get into that, what Judge Niemeyer has recited may go to the compelling government interest part of RLUIPA, but I don't think it goes to the least restrictive means, which is your burden to prove with evidence, which I'm not sure I see any. Sure. I agree it's also goes to that primarily, Judge Agee. So, Judge Niemeyer, there's a lot there. Let me start. It goes down to the one proposition. I don't want to get it too confused, because the one proposition is that television is allowed as an incentive. And you've said many times, people have testified, it's the most powerful incentive we have. Everybody likes television. Sure. So if he's in SM0 and is unwilling to participate in the incentives, he doesn't get a television. Correct. And that is not a defense to RLUIPA. Your defense would have to be, well, there's some reason for an SM0 person that couldn't get television. You haven't advanced that at all. I agree with, I think, most of that, Judge Niemeyer. Let me explain where I think that goes wrong. I don't think even under Mr. Greenhill's view, he has any sort of right to a television. He has a right, he claims, to access Juma. He has identified television as a way that he could access Juma. But I think it's a point of common ground that he has absolutely no right under RLUIPA or anywhere else to access a television. So I think that's important. Judge Niemeyer, you brought it up a couple times, so I want to flag it. No, no. But the alternatives get tougher for you. If you recognize Juma as a serious aspect, Supreme Court's referred to Juma, or Juma Rye, or whatever it is. If you recognize it as a serious proposition, and I don't see anybody taking a debate with that. No. If you recognize it, then the question is, why is he being denied access to Juma in any respect? He's willing to do it on television while he's in SM0. Absolutely. But I think that's an important concession he makes right out of the gate. I think there's a flavor to his argument at various points that we have to— Stick with my question. I'm trying to, Judge Niemeyer. I apologize. So you've identified the fact that we've said that it would be possible for us to do this. I want to be very clear about what we have and have not said. The relevant page of the JA is JA 182, and this is where he requests that we admit that it would be possible for us to do that. We have not admitted that it would be a good idea. Let's get that behind us. So what is your response as to why you didn't give him a television while he's in SM0? The only reason you guys have said it is because it's a privilege, and he hasn't earned a privilege. Well, first, Judge Niemeyer, I guess I'd say, and it was pointed out, I think, by Judge Agee, that's the ground—I agree that there is a flavor of that to the district court's decision. Of course. And as the appellee, we've defended the district court's decision, the decision given by the district court. But I think this goes back to something Judge Agee said. I think the procedural posture here is important. We move for summary judgment. We got summary judgment on a ground that the district court articulated. Mr. Greenhill appealed, and as the appellee, we're defending the decision in our favor. Procedurally, Mr. Greenhill did not at any time move for summary judgment, so I don't think there's any ability of this court to grant summary judgment in his favor. And I don't see my other—my friend on the other side. And as the—again, he didn't move for summary judgment. So when—if this case were to go back, per what Judge Agee said earlier, we are not limited to the defenses that we gave in this summary judgment motion. We can defend this case at trial on any ground that we see fit as the party that moved for summary judgment. So I think that is important. But I also think— But what's the factual dispute here, or lack of factual dispute, with regard to why complete denial of television for the religious services is the least restrictive alternative? Well, Judge Agee, I think with respect, I don't think that's the right framing under RLUIPA. I think the right framing under RLUIPA is whether any of the alternatives that he has proposed could be done consistent with our conceitedly compelling interests. He has requested a television. Correct. For the service on Friday. Correct. And you have denied it. Well, Judge Niemeyer, he requested two things. His first request was that he be allowed to physically go, and the fact that his attorney has now given that away does not change the fact that his first submission— Okay, fair enough. But you can deny it. The question I have— Absolutely. Forget the posture, procedural posture. Sure. Why is he being denied a television in any respect? In any respect you pick. Sure. For one hour between noon on Friday and Sunday. That's a great question, Judge Niemeyer. I've asked that question myself. Here's what I have been told. The reason that he's been denied access to a television in his cell is because— No, I didn't say in cell. No, I know, but we have to think through this. I just want to say, why is he denied a television at all for that service? I don't care whether you do it in your own warden's office. Why is he being denied a television? Because there's no way to do so consistent with prison safety and security, is what the Virginia Department of Corrections has told me. But doesn't your policy provide that SM0 inmates can be or should be provided access to television as a religious accommodation? Judge Clay, I asked myself that. I asked my client that question, too. What's unsafe about a television? What's unsafe about a television? This individual has been convicted eight times for tampering with equipment. That's what's unsafe about giving him a television. Well, he's talking about looking through the bars into the pod. In other words, I'd like to just get a practical saying. What's the problem of giving this man a television for an hour? It seems to me I have seen nothing in the record. And as a matter of fact, I think there's suggestions that you guys could do it, but it's contrary to your safety program. In other words, they incentivize it. And the answer you just gave, that you said you were told exactly where you are in your brief, and it's not a lawful defense. Well, to go back to the question to Judge Clay, I want to make sure that I answer the question about the policy. There's been a number of questions from the court about the policy. What I've been told, I suspect this is not going to be a thrillingly satisfying answer, is that it is an outdated, superseded version of the policy, that the current policy, which is available on VDOC's website, does not say that you have access to television for religious purposes in SM0. That's the factual answer I can give you. A step-down program was put in place in 2013. Before 2013, there was no step-down program, and it took a period of time to update the written policies to reflect that. That's the factual answer. Now, in terms of the question, I guess I'll just flag on that. This court has said, and the Supreme Court has said, that assuming that that is a violation of the prison regulation, that assuming there is a violation of an internal VDOC regulation, that does not give rise to First Amendment liability or liability under RLUIPA in and of itself. I think that's a point of black-letter law. To Judge Niemeyer, to your question of why we can't do this, I apologize for going... I'm not saying why you can't, I'm saying why are you not? Right, and I've asked that question. And the answer you just gave me is an illegal answer. The illegal answer is it would be contrary to our safety incentives. I apologize, Judge Niemeyer, that's not what I meant to say, and if I said that, I misspoke. What I've been told is that it is inconsistent with prison safety and security. Any of the alternative, I mean, I have asked about every single alternative in the brief, and I apologize for going to the individuals, but unfortunately from the VDOC perspective, you can't ask... What's the evidence in the record, though, that that answer is evidentiary proof of the least restrictive alternative? The answers seem to be conclusory as a matter of policy as opposed to an affidavit or a deposition that says, we can't let this inmate do it for these reasons. I don't see anything like that in this record to this point. Judge Agee, I agree with you with regard to some of the alternatives he's proposed, but I think the reason involves the procedural history, the somewhat winding procedural history of this case. Except in your brief, you answer my question, and this is the way you answer my question. You say, prison officials have learned that an inmate offender's ability to possess a television inside a cell is something that most inmates covet and is one of the biggest motivators for encouraging offenders to participate in the step-down program.  Rather than a right, and something that SM0 officers may earn as they progress through the step-down program. Yes. That is fine for safety and maintenance, but it's not fine for RLUIPA because you could do it, but you don't do it because it would then undermine your privilege devices, incentivizing. So, again, Judge Niemeyer, as the party defending a district court decision, we were defending the rationale that was given by the district court, but I think there's an important distinction. Assume the court disagrees and concludes that that's legally incorrect. That's different from saying there are no other defenses of it. And, again, to go back to JA182. Can you answer why it would be you can't safely provide a television to him? Yes. Why? Again, I think I have to go version by version. There are different ways we could provide him with a television for an hour, and the answer is different depending on which one you give. So one option that he has now proposed in his brief is that we bring a television into his cell for an hour a week. The reason we can't do that is safety and security because every single time that the guards go into the cell, they have to take Mr. Greenhill out of the cell. They then have to install the television. They have to repeat the process, and this is an individual with a repeated history of assaulting guards and other staff. Is any of this in the record? I want to make sure I answer your question, Judge Agee. Some of it is in the record. Some of it is not. So what is in the record is this. I have not seen, as a matter of fact, the discussions you guys have about the television does not relate to any safety or security that's overriding. In other words, as a matter of fact, even your policy, as you say it's an outdated version, but it may be the one that was applicable, which is indicative of your approach to this, which is that it's an incentive and a privilege, not a right. And that is a piece of it. I agree, Judge Niemeyer. You've mentioned it again that we've said that it's possible. I would really encourage the court to look at JA-182. Somebody suggested if you put him in a classroom there with the television, he would have an escort to the classroom, watch it for an hour, and then escort him back. Right, and that would be a significant diversion of resources that would be necessary to remove a high-security prisoner from his cell, bring him to the classroom, escort him while he's in. These are individuals. How about put the television into the pod and let him look through the bars? I asked that question as well, Judge Niemeyer. What's the problem there? Well, it depends on where you put it in the pod. If you let him look through the bars, these cells, as you perhaps would know, well, there are no bars, I guess, first of all. There are two small openings, so there are no bars that he can just look through. In order for him to be able to watch it through the door to his cell, it would have to be quite close to the door of the cell, at which point the television is physically obstructing the view into the cell, which, as you can probably imagine from a safety and security perspective. Is any of this stuff in the record that you're telling us now? Some of it is, Judge Agee, but let me explain why I think it's not in the record. The reason it's not in the record is that when Mr. Greenhill first sought relief from VDOC, he didn't request any of those things. He requested two and only two things. This is at JA-18. That's his initial complaint. The only two things... I mean, do you have some case law that says that you're limited to what the inmate proposes in the administrative portion as opposed throughout the litigation? I mean, these are all things that are before the court in one form or the other. So it seems like to me when they're before the court, they're a fair game for there to be evidence put in the record for summary judgment purposes. Well, on that front, Judge Agee, I think they come before the court at different phases. So some of these... And you're not a witness. I'm certainly not, Judge Agee. I'm doing my best to answer the court's questions. You've asked a lot of questions of the witnesses. No, but I think, Judge Agee, it's fair to say if the question is why didn't VDOC say these things in the record, if the answer is because he hadn't proposed them yet. That's just the common sense. He did propose them. He has quite a list of things he proposed. And the response you guys gave and gave to the district court in giving your brief here is not based on safety or maintenance. It's based on the incentive program that we give televisions only as a privilege, not as a right. And I agree that that would be a terrific thing, and you should continue to do that based on my layperson's observations. But for the reloop of purposes, I think giving him an hour of television on Friday seems to me you have to make a pretty good case that that couldn't be done. So to Judge Agee's question of what's in the record, two things that are definitely in the record. His disciplinary history is in the record. That is at JA 391 and 392. And his disciplinary history that is in the record lists eight instances of being sanctioned for tampering with equipment and multiple instances for threats against guards. So to the extent, that is certainly in the record. The other thing that is in the record at JA 183. You don't have somebody from the prison coming in and saying, look, we've analyzed this guy's record. We've dealt with him for all these years. We don't believe, based on all these prior incidents, that it's safe for us to have a guard go into the cell, remove him, put the TV in. Are we giving him TVs before he's messed them up? It's incumbent upon you, I think, to present that as evidence. Congress created this reloop of things. We didn't. And so that's what appears to be required. Judge Agee, I agree with you. I have reviewed the record. I have not seen an affidavit that recites what you just said, and I can't represent that I have. And this comes back to a question I asked of Mr. Greenfield. The burden is upon VDOC to establish why we can't have this television. I think that's been the point of Judge Niemeyer's questions. But what is that burden? Is it only to consider and grant or refuse the suggestions from the inmate him or herself? Or is it upon VDOC as the institution charged with administering the penal system in the Commonwealth of Virginia to, well, we've thought through this, and here are the reasons why, and why not with each accommodation? Accommodation is not the right word. I understand. But that's what I come back to. I agree with Judge Agee. My concern rests in the record as well, but I think the corollary to that is where does this list of possible alternatives come from? Sure. Your Honor, I don't think this court has in any decision I've seen squarely answered the question of how we do that. I think there are two options at the outer edges that are both untenable, and I think there's a middle ground that's unresolved. So I think on one hand, I think it is untenable to suggest that the prison official has to – this is not an APA challenge. We don't have to literally identify every conceivable alternative thing we do and explain why we can't do it without anyone ever asking. I think that's untenable, and I don't understand Mr. Greenhill to argue we have to do that. The flip side, though, on the other side is, I mean, I also concede, and the Supreme Court says this in Holt, if there is something that is blindingly obvious that you could do, it seems incumbent on the prison official. Well, I understand your position to be he's requested a television. You've denied the television. The reason you've given formally up to this point, the district court accepted, was that it would destroy the incentive program and the step-down program, and it's a privilege and he has to earn it. If we reject that as a reason, your position would then be we still have not addressed costs and safety. Absolutely. And we'd like to do that. Absolutely. I agree with you that we said the things in the district court that you have said, Judge Niemeyer. I don't think that's the only thing we said in the district court, because if you look at page 183, that's where there's the request for admission where we say it's physically. So he says, give me a television in my cell. Admit that you could do that. And what we say at 183 is we admit that we are physically able to do that. But then the next sentence specifically refers to security and housing classifications. So the fact that it's technologically So somebody would have to analyze what those are. And, of course, if you get to the other extreme where you put the television in and ten minutes later he destroys it, it seems to me now you guys are off the hook. I would certainly hope so, Your Honor. At least I think so. I would certainly hope so. I see my time is running out. Let me just leave the court with one thought. I think it's important to emphasize that this is a very specific number of offenders. The current estimate I have is ten in the entire Virginia Department of Corrections. And the reason they're there is because of a persistent series of serious disciplinary violations. We have tried less restrictive housing with these individuals. It hasn't worked. But this is not a broad VDOC policy that applies to offenders in general. Thank you. Just on that, I don't think the arguments being made, and I hope our questions don't suggest that you should relax your step-down system or the disciplinary thing. I will communicate. It looks like a well-thought-out system except for the grooming bit. I don't understand what your grooming rules are now. I guess there are no grooming rules now, right, on the beard? May I answer, Judge Neiman? Sure. So my understanding of the current policy is that inmates are permitted freedom in personal grooming so long as it doesn't promote gang affiliation and so long as the inmate has not previously been convicted of trying to hide something in their beard. Thank you very much. And does that moot, at least from a VDOC standpoint, does that moot the grooming standard challenge here? I'm not sure if it moots it in an Article III sense. We think that under RLUIPA, and my friend on the other side has conceded, the only relief you can get under RLUIPA is injunctive relief. So I think as a practical matter, yes. Thank you. Okay. Thank you, Mr. Twyla. Mr. Greenfield? Your Honors, just briefly, and let me start with the end. Even taking into account the grooming restriction that opposing counsel submitted this summer, well after briefing had concluded, Mr. Greenhill's religious beliefs as they pertain to the necessity to maintain a beard are still substantially burdened. The grooming policy is clear that he would have to shave his beard to a quarter inch initially in order to comply with their identification photo requirements. If he were to shave to a quarter inch, it would be, you know, six months to nine months before he would have a full four-inch beard. So he would be out of compliance with his religious beliefs in light of that. And I'm glad that they don't argue Article III mootness. If they did, I would. Let me ask you the point that the State raises. If we were to agree that the ground of privilege, television is a privilege and not a right, agree that for purposes of at least in this case the one-hour services, that's not an adequate defense. The State still has not had the opportunity in the procedural context to put on a response to your suggestions as to what could be done. And there are defenses the State could have. I think anything that makes it impossible in terms of cost, not impossible, makes it more burdensome from the State's point of view in terms of cost, safety, that type of thing should be considered, shouldn't it? Well, can I go back to your frame this answer by going back to your earlier question, which is what is there left to do? And opposing counsel suggested that below he could marshal evidence that the Juma restriction, that prohibiting him from access to Juma is the least restrictive means of attaining a compelling interest. But they had two opportunities to do that already at summary judgment. They haven't put in that evidence. And I would argue that this Court should seriously consider that they have waived or at the very least forfeited any opportunity to now argue. That's not the relief you asked for in your brief or in your oblivery. You asked for a reversal of summary judgment and trial. Your point is well taken. I was merely responding to Judge Niemeyer's line of questioning. And I'm sorry if I got lost there and didn't answer the second part of your question. Well, I was just saying even under a strict scrutiny, the State can advance interests that would justify not providing the television. Yeah, they could absolutely. Under RLUIPA, they could marshal evidence and prove that providing Mr. Greenhill access to Juma, whether by television or some other means, is wholly incompatible with their penological objectives. In other words, that if they were to afford him access to Juma, it would unleash mayhem. And they've not come anywhere close to doing so on this record. In fact, they've argued something entirely different, as we've all recognized, that television for entertainment purposes, television writ broadly, is a privilege that offenders covet. They've not answered the question that Mr. Greenhill posed. And I just want to clarify one thing. Opposing counsel said in their answer brief in here that Mr. Greenhill set forth only one objective and that the remainder of the alternative, I'm sorry, that the remainder were set forth by his counsel on appeal. And that's simply not true. Mr. Greenhill's proposed each of the three alternatives in the record below, that he be afforded an opportunity to watch Juma in a cage in a classroom, that they install a communal television, and that he be permitted to borrow a television in his cell for an hour a week. All of that is in the record below. This is not my say-so. It's Mr. Greenhill's evidence. Thank you. Thank you very much, Your Honors. We'll adjourn the court signing die and come down and greet counsel. This honorable court stands adjourned, signing die. God save the United States and this honorable court.
judges: Paul V. Niemeyer, G. Steven Agee, Thomas S. Kleeh